Grant H. Goodman, State Bar #009463
Grant H. Goodman, PLLC
5110 North 44th Street, Suite L200
Phoenix AZ 85018
Phone: (602) 343-1477
granthgoodman@msn.com

Attorney for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| GENERAL ELECTRIC CAPITAL CORP., | Case No.: CV03-02319 PHX RGS |
| Plaintiff, | DEFENDANTS' FED.R.CIV.P. 52(c) JUDGMENT ON PARTIAL FINDINGS, AND PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| vs. | |
| GRANT H. GOODMAN and TERI GOODMAN, husband and wife, | (Oral Argument Requested) |
| Defendants. | |

Defendants, through counsel undersigned, lodge their Fed.R.Civ.P. 52(c) Judgment on Partial Findings, together with the attached Proposed Findings of Fact and Conclusions of Law pursuant to the Memorandum of Points and Authorities, attached hereto and incorporated herein by this reference.

DATED this 13th day of January, 2006.

GRANT H. GOODMAN, PLLC


/s/ Grant H. Goodman, #009463
Grant H. Goodman
Co-Counsel of Record for Defendants

## **MEMORANDUM OF POINTS AND AUTHORITIES**
## **INTRODUCTION AND OVERVIEW**

**General Electric's contract damages (unpaid and executory lease payments), reduced to present value, are $399,000.00. The uncontested fair market value for the equipment at issue was approximately $700,000.00. The equipment, if sold in a commercially reasonable manner, (which it was not), should have yielded $700,000.00. Defendants must be given credit as against plaintiff's contract damages ($399,000.00) for the presumptive off-set the plaintiff would have received had the collateral been disposed of in a commercially reasonable manner ($700,000.00) by contract, common and uniform law.**

**The plaintiff's claimed damage under its liquidated damages clause in the Master Lease Agreement pursuant to the "Casualty" clause must be set aside. General Electric's damage claim may not place it in a superior financial position to that which it would have occupied had the contracts been fully performed.**

**At trial, both parties were in agreement that the executory lease payments General Electric was entitled to at the time of default through expiration of the lease contracts totaled $399,000.00. This financial fact was uncontested and was not controverted at trial. General Electric and the defendants also agreed at trial that pursuant to the contracts, the common law, and the Uniform Commercial Code (A.R.S. §47-528) that the defendants were entitled, in mitigation of plaintiff's damages, to the "commercially reasonable" fair market value credit for the sold equipment.**

**Accordingly, the defendants have submitted uncontroverted and uncontested valuations through defendants' ownership, Grant H. Goodman, and defendants' Chief Financial and Operations Officer, James Carmichael, in his expert capacity,**


**credibly testifying to a cumulative value of the sold equipment of approximately $690,000.00 to $710,000.00.**

**On the other hand General Electric argued that it may engage in a patently unreasonable commercial disposition of the equipment which included no marketing, no advertising, through a single-source, unnoticed sale to a single entity in a "private" non-competitive sole-source bid at a $100,000.00 discount to its own "unreserved" liquidation appraisal in the amount of $446,500.00. G.E. provides the Court no law, statute, dicta, or legislative history which condones such behavior as an element in proof of its claimed damages.**

**The math, as dictated by the uniform and common law, reflects that the lessor, in satisfaction of its contract damages (reduced to present value), ($399,000.00), should have credited the defendants $700,000.00, which presumptively would have been realized for the sale of the equipment had the plaintiff conducted a commercially reasonable disposition of the assets. Alternatively, even were the Court to consider plaintiff's "unreserved" liquidation value, the equipment value credit against General Electric's claimed damages places the lessor ($46,500.00) in a financially superior position to that which it would have occupied had the contracts been fully performed.**

## I. SUMMARY OF ARGUMENTS/FACTS

General Electric has claimed liquidated-punitive damages ranging from 100% (disclosed the day of trial), to 300% (see plaintiff's Complaint), to 400% (in General Electric's only pretrial sworn testimony of its elected corporate representative), in excess of the executory lease contract payments at full performance.

According to the express terms of the Master Lease Agreement and Schedules at issue, had Rockland Materials fully performed its obligations, it would have made total lease payments of $1,064,000 to General Electric (combining the rental obligations and

supplements/Schedules under both contracts).  Absolutely nothing in the Master Lease Agreement, Schedules or other supplements required the lessee or the guarantors to renew the lease obligations upon expiration of their stated terms.  Upon the lease expiration dates, Rockland Materials was free to terminate the leases without further obligation, and return the equipment to General Electric without any further obligations, payments, assessments, attorneys' fees, or any claims whatsoever related to the collateral.

In contrast to the actual damages described above, General Electric seeks damages that are allegedly represented in the Master Lease Agreement "Casualty Occurrence" provisions.  According to General Electric, the "Casualty Occurrence" values are assessed when the equipment is lost, destroyed, stolen, or rendered unusable.

There is no dispute that the claimed ***liquidated damages*** are more than (depending upon the date of disclosure by General Electric) twice to four times the amount of rent that General Electric lost as a result of the rejection of the equipment. General Electric cannot prove this excessive windfall through any recognized proof of damages.  It is, quite simply, an unacceptable and unenforceable penalty.

Under applicable Arizona and Ninth Circuit law, a liquidated damage provision must put the lessor in no better position than it would have occupied had the lease been fully performed.  Damage claims are patently unenforceable when requiring damages in addition to other damages which by themselves would put a lessor in the position it would have occupied had the lease been fully performed.  The lease contracts and schedules at issue have no governing terms, conditions, or covenants which require that the equipment at issue be re-leased or that the lessee would be charged with a stipulated residual value amount upon the leases' expiration.  In the absence of a "casualty occurrence", of which there were none by definition under the contracts, the only requirement at lease expiration was the return of the equipment in good working order. The equipment was well maintained and there were no claims made under the contracts

for any deterioration in value or useful life of the equipment at trial, or in pretrial discovery.

Simply stated, had Rockland Materials waited to close its doors until the Schedules had run their natural courses, General Electric would have had absolutely no recourse against its lessee to recover any additional amounts. General Electric, admittedly having accepted the foreseeable business risk that Rockland Materials would not renew the lease, and considering that there were no residual value clauses, may not now attempt to recoup additional "damages" by means of an arbitrary provision which puts General Electric in a position far superior to that which it would have been in had the lease contracts been fully performed.

General Electric agrees, as it must, that ***§2A-504*** of the Arizona Uniform Commercial Code ("UCC") governs the validity of the ***liquidated damage*** provision at issue. As correctly summarized in General Electric's seminal appellate brief on the issue, other (all) courts have uniformly concluded that under §2A-504, a liquidated damage provision must put the lessor in no better position than it would have been in had the lease been fully performed. When attempting to predict an Arizona State Court's position, a federal court may presume that the state court will adopt the majority view under the UCC. There is no reason to disturb that presumption here where the unanimous position of those courts that have considered §2A-504 is fully consistent with general principles of Arizona law.

General Electric simply cannot avoid the fundamental principles of contract law which state that "the purpose behind the allowance of damages for breach of a contract is to place the injured party in the position he or she would have occupied if the contract had been fully performed." *Frontier Leasing Corp. v. Griffin Petroleum, Inc.*, 122 F.Supp.2d 1172, 1176 (S.D.Iowa 2001) (applying §2A-504 as adopted by Iowa, and

striking down an acceleration clause that "would clearly enable a lessor to earn interest on early rent payments that the lessor would not earn if no default occurred").

There is absolutely nothing in §2A-504, or the case law interpreting this section, which mandates that it is reasonable for General Electric to recover any amounts other than what it was expressly entitled to recover under the Master Lease Agreement and Schedules had they been fully performed. General Electric's attempt to manipulate such fundamental concepts of contract law to secure a windfall under the guise of a liquidated damages provision must be rejected.

The Seventh Circuit has also weighed in on the issue rejecting the argument for liquidated damages by pointing out that the express terms of the lease at issue determined the lessor's compensation. The Seventh Circuit concluded that "[w]here a damages clause is designed to assure the plaintiff more than its actual damages, and where the amount of the damages is invariant to the gravity of the breach, then the damage clause is not a reasonable effort to estimate damages, and is a penalty." *Raffel v. Medallion Kitchens of Minnesota, Inc.*, 139 F.3d 1142, 1146 (7th Cir. 1998); *see, also, Lake River Corp. v. Carborundum Company*, 769 F.2d 1284, 1291 (7th Cir. 1985) (holding that a damage provision that relied on a damages formula that "could be expected to generate profits ranging from 400% of the expected contracts profits to 130% of those profits" was unreasonable.)

The "Casualty" liquidated damages are paradigmatic of an unreasonable and thus unenforceable liquidated damage clause.

### I(A).  THERE IS NO AUTHORITY TO SUPPORT GENERAL ELECTRIC'S POSITION

As acknowledged by General Electric during the trial of this matter, had Rockland Materials fully performed by fulfilling all of its rental obligations and then returning the equipment to General Electric, General Electric would not have recovered a dime more

than its stated rate of return on the face of the Schedules.  Simply put, General Electric does not (because it cannot) explain how recovering $400,000.00-$1,000,000.00 more in liquidated damages than it would have received had the contracts been fully performed does not leave it in a far superior position in direct contravention of the contracts at issue. Accordingly, General Electric structured, calculated and mathematically demonstrated on the face of the Schedules the precise "benefit of the bargain" it chose to receive for the life of the lease contracts in monthly installments.  While General Electric may have desired to have restructured the lease agreements to support its trial claims, it did not, and it knowingly and admittedly chose not to do so and cannot now ask this court to unfairly remedy that decision by rewriting the General Electric contracts.

## II.     CONTROLLING AUTHORITY

Throughout these proceedings, the defendants have demanded strict proof of plaintiff's claimed damages pursuant to the Master Lease Agreement and Schedules at issue.  The plaintiff has failed to produce evidence on its claimed damages pursuant to Chapter 2A, Title 47, Arizona Uniform Commercial Code.  Specifically, pursuant to A.R.S. §§ 47-2A-504, 2A-507, 2A-526, 2A-527, and 2A-528, the plaintiff bore both the burden of production and the ultimate burden of persuasion at trial.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).  As discussed below, the plaintiff was able to produce no evidence in this case in support of its damage claims, which exceed by 100%-400%, its unpaid and executory lease payments through completion of the lease contracts at issue.  *In re Montgomery Ward Holding Corp.*, 326 F.3d 383 (3rd Cir. 2003).

The plaintiff has sought liquidated and/or punitive damages which place General Electric in a far more lucrative position than it would have been had the contracts been fully performed.  The unanimous positions of the courts who have considered this position have declined the invitation to allow extra contractual liquidated and/or punitive

damages in any context. *In re Montgomery Ward Holding Corp., supra*; (*see also, General Electric Appellate Brief* filed April 26, 2002 to the Third Circuit in, *In Re Montgomery Ward Holding Corp.*); *(see, also, Reed Smith*; <u>Judicial scrutiny of liquidated damages:</u> <u>Wariness moves beyond Texas</u>, (July 21, 2003)), as introduced at the trial herein.

In addition to constraints placed upon the parties under the Arizona Uniform Commercial Code, the Ninth Circuit provides the parties with a liquidated damage clause analysis which is *per se* unconscionable to the extent that it provides General Electric with damages it would not have received had the contract been fully performed. *Siletz Trucking Co. v. Alaska Intern. Trading Co.*, 467 F.2d 961 (9th Cir. 1972).

The Ninth Circuit requires that the liquidated damage formula represent a reasonable and accurate approximation of prospective damages in the event of a default. Additionally, to ensure that the formula is appropriate, the claimant must have discounted its expectations under the lease to present value (which was not accomplished here), and secondly, the lessor is required to give the lessee credit for the benefits to the lessor upon default. *Siletz Trucking Co., supra.* Stated otherwise, in order for a liquidated damage clause to pass judicial scrutiny, the claimed amounts must be a reasonable forecast of just compensation for harm caused by any breach. Secondly, the harm that is caused by any breach must be one that is incapable or very difficult of accurate estimation. *Pima Savings & Loan Association v. Rampello*, 168 Ariz. 297, 812 P.2d 1115 (App. 1991).

As the court is aware, the uncontested evidence, affidavits, and sworn declarations indicate that General Electric had estimated, to the penny, the benefit of the bargain under the original contracts and schedules rolled into one monthly lease amount. Consequently, General Electric's punitive damage claims were never "incapable or very difficult of accurate estimation", since General Electric performed all necessary computations, with mathematical certainty, on the face of the contracts.

Finally, it has long been Ninth Circuit law that the adoption of the Uniform Commercial Code requires "commercial reasonableness" and "good faith" in disposition by resale. *Coast Trading Co. v. Cudahy Company*, 592 F.2d 1074 (9th Cir. 1979). The court concluded as a matter of law that the plaintiff must prove that every element of the disposition was in good faith and in a commercially reasonable fashion, "required in every aspect of every sale." *Id.* at 1080. The plaintiff may not resell in a fashion which exaggerates its damages. *Id.* at 1081.

### III. THERE CAN BE NO WAIVER BY THE DEBTOR/GUARANTOR AS TO THE COMMERCIAL REASONABLENESS AND DISPOSITION OF THE EQUIPMENT, INCLUDING ADVANCE NOTICE

*Morgan Buildings and Spas, Inc. v. Turn-Key Leasing, Ltd.*, 97 S.W. 3d 871, 2003 W.L. 245612 (Tex.App.Dallas 2003); *In re Kirkland*, 915 F.2d 1236, 12 U.C.C. Rep.Serv.2d 1204 (9th Cir. 1990).

As the trial unfolded, it became clear that the plaintiff had apparently solicited only one purchaser for the collateral, sought no competitive bidding of any kind, in any market, and failed to market the collateral or assets to any other entity or market. The plaintiff failed to conduct any effort relative to a public or private sale, save the "sweetheart" deal conducted with the one and only bid on the equipment, Arizona Materials. In fact, the record will reflect that despite producing an "unreserved" liquidated appraisal, (meaning that there was no amount low enough which General Electric would reject in satisfaction of its asset sale) the plaintiff unilaterally sold the equipment for a $100,000.00 discount to its own appraisal which it had just received three weeks earlier, in the amount of $445,500.00.

On marketing and resale, a creditor must act in a commercially reasonable manner, including advertising and making normal and reasonable contacts within the industry. Taking the easy way out for a quick sale to an entity already using the equipment does not constitute commercially reasonable behavior and therefore there is no deficiency

allowed in that context. *Hancock County Bank v. American Fletcher National Bank and Trust*, 276 N.E.2d 580 (Ind.App. 1971). Further, the failure to give notice as would guaranty competitive bidding ensures that the creditor presents uncontrolled opportunities for self dealing. The court must look to whether there has been any solicitation of bids, arrangements for presale inspections, sufficient advertisements and public notice. The lack of this conduct is *prima facie* evidence that the sale and disposition were <u>not commercially reasonable</u>. *Kobuk Engineering & Contracting Services, Inc. v. Superior Tank & Construction Co-Alaska, Inc.*, 568 P.2d 1007 (Alaska 1977). Guarantors are entitled to insist that the sale be commercially reasonable. *United States v. Willis*, 593 F.2d 247 (6th Cir. 1979).

In order to appropriately market and advertise the collateral in this instance, the plaintiff was required to conduct reasonable advertising aimed at informing potential buyers and the larger market of brokers and potential buyers through readily available advertising. *Ford & Vlahos v. ITT Commercial Fin. Corp.*, 8 Cal.4d 1220, 36 Cal.Rptr.2d 464, 885 P.2d 877, 25 U.C.C.2d 630 (1994).

"In order for a seller to use a resale price as the measure of its damages, it must be shown that all proper measures to secure as fair and favorable a sale as possible were taken, and that the sale was made fairly to the best advantage of the debtor. Without a determination that the sale price represents either the market price in the case of an available market for the goods, or that the resale was a fair test of the actual value in the absence of an available market, that sale price cannot be determined as the market value." *Pantsmaker, Inc., v. Orbit Mfg. Co.*, 32 U.C.C. Rep. Serv. 103, 1981 WL 138016 (N.Y.App.Term. 1981).

Where the disposition of the assets is not accomplished in a commercially reasonable manner, typically a presumption is invoked so that the value of the collateral sold is equal to the indebtedness. *ROC-Century Associates v. Giunta*, 658 A.2d 223 (ME.

1995).  By contrast, where the phrase "commercially reasonable" is used in disposition of collateral under Article 9 proceedings, where the creditor fails to sell repossessed collateral in a commercially reasonable manner, courts typically adopt the "rebuttable presumption" rule to determine if a deficiency judgment may be awarded.  The rule provides that a presumption arises that the collateral's value equals the claimed debt, and a creditor may only recover a deficiency balance if it can prove its damages otherwise. *Ruden v. Citizen's Bank & Trust Company of Maryland*, 99 Ld.App. 605, 638 A.2d 1225, 23 U.C.C.2d 623 (1994); *Marks v. Powell*, 162 B.R. 820 (E.D.Ark. 1993).

## V.   GENERAL ELECTRIC HAS FAILED IN ITS BURDEN OF PROOF RELATIVE TO ITS CLAIMED DAMAGES

The plaintiff was required to establish every element of its claimed damages under the Uniform Commercial Code (2A-527, 528, 523) including: "actual damages"; that damage sums were "commercially reasonable"; proof of damages to a "residual interest" if contractually allowed; as well as loss or damage proximately resulting from any claimed breach; and that losses were reasonably certain and not the subject of conjecture or speculation; proof of lost profits, if any, must have been "reasonably certain". *Air Caledonie International v. AAR Parts Trading, Inc*., 315 F.Supp2d 1319 (S.D.Fla. 2004). "In order to recover for lost future profits, a party must prove income and expenses of the business for a reasonable time period prior to the alleged breach.  If the party presents evidence only of gross receipts or fails to prove expenses with some specificity, an award of damages cannot stand."  315 F.Supp.2d 1319, 1338-45.

In *Sharon Leasing, Inc., v. Phil Terese Transportation, LTD*., 299 Ill.App.3d 348, 701 N.E.2d 1150, 233 Ill.Dec. 876 (1998), the truck lessor there, as here, was required to prove its substantive damages "and to establish a reasonable basis for the computation of those damages." *Id.* at 356.  The court concluded that the damage claims must not result in a windfall to the plaintiff and that the claimant may not be put in a better position than had the contract been fully performed.  The court concluded that damages had not been

proved, *since the plaintiff failed to follow its own contract*. Further, the contract was necessarily strictly construed against the drafter-plaintiff, under terms far more reasonable than those presently. *Id*. at 356-60. *See also*, *AAR International, Inc., v. Vacances Heliades S.A.*, 349 F.Supp2d 1114 (N.D.Ill. 2004).

The burden of proof rests upon the plaintiff in this matter to establish the fair market value of the collateral at the time of the sale by presenting credible and objective evidence of the value other than the price received or the opinions of its own agents or employees. *Connecticut Bank and Trust Co., N.A. v. Incendy*, 207 Conn. 15, 540 A.2d 32 (1988).

## VI. EQUITABLE RECOUPMENT

For example, the guarantors were granted judgment against plaintiff bank defeating a deficiency judgment on the theory of equitable recoupment in the Uniform Commercial Code context. *Connecticut Bank and Trust Co., N.A. v. Incendy*, 207 Conn. 15, 540 A.2d 32 (1988). The secured creditor failed to conduct or to prove through credible evidence that it conducted a "commercially reasonable" sale. The creditor's only evidence there, as here, was the testimony of its agents or employees on the issue of fair market value. The court found, "In any event, the burden rests upon the secured party to establish the fair market value of the collateral at the time of the sale by presenting credible and objective evidence of the value other than the price received or the opinions of its own agents and employees." *Connecticut Bank and Trust Co., N.A.*, *supra,* at 31. Accordingly the defendants are entitled to offsets for amounts claimed by G.E. in the ancillary bankruptcy proceedings totaling $67,000.00.

The defendants presently are not making an affirmative claim; rather they seek inclusion of bankruptcy court ordered administrative claims filed by the plaintiff as a reduction of any amount found to be due the plaintiff which is "in the nature of a defense arising out of some feature of the transaction upon which plaintiff's action is grounded."

*Aetna Finance Company, v. Pasquali*, 128 Ariz. 471, 626 P.2d 1103, (App. 1981). The defense here did "arise out of mutual obligations or covenants of the loan transaction upon which suit was founded." 128 Ariz. 471, 473. The same result is achieved in bankruptcy. *In re Madigan*, 270 B.R. 749 (9th Cir. BAP, 2001); *In re TLC Hospitals, Inc.*, 224 F.3d 1008 (9th Cir. 2000).

The theory of equitable recoupment may be used defensively to reduce or eliminate the plaintiff's claims. The equitable defense is neither dependent nor predicated upon cash, or cash equivalents paid previously to the plaintiff arising out of the same commercial transaction.

### VII. A LOW RESALE PRICE IN COMBINATION WITH PLAINLY NON-COMPLIANT RESALE PROCEDURES IS THE PARADIGMATIC COMMERCIALLY UNREASONABLE RESALE

General Electric's corporate representative was not in a position to contest the reasonable value assessments by the defendants in these matters, nor was any evidence presented by General Electric to controvert the fair market value asset values introduced as a matter of record. Accordingly, a 50% reduction in uncontroverted and uncontested fair market valuations in combination with plainly non-compliant resale procedures (marketing and advertising to a single buyer) is the paradigm of a commercially unreasonable resale and always triggers various debtor remedies. *Villela Enterprises, Inc. v. Young*, 108 N.M. 33, 766 P.2d 298, 8 U.C.C.2d 274 (1988); *White & Summers*, 5th Edition, Volume 4, page 404, 406, footnote 22. Additionally, the lack of advertising and amounts received in comparison to the fair market value are prerequisites to determining whether the creditor engaged in a commercially reasonable disposition of the assets. *Deutz-Ellis Credit Corp. v. Jensen*, 458 N.W.2d 163 (Ct.App.Minn. 1990).

## VIII. GENERAL ELECTRIC MAY NOT PLACE ITSELF IN A POSITION BETTER THAN IT WOULD HAVE OCCUPIED, HAD THE CONTRACTS BEEN FULLY PERFORMED

As discussed at trial, General Electric thoroughly and effectively crafted and summarized the substance of the Uniform and Commercial laws setting aside liquidated damages in, *In re Montgomery Ward Holding, supra.* During trial the plaintiff could not controvert, or contest, the fact that General Electric, on behalf of its wholly-owned subsidiary, Montgomery Ward, successfully argued that under the Uniform Commercial Code, 2A-504, that a "casualty value" was both an unenforceable penalty and inherently unreasonable as a matter of law. *In re Montgomery Ward Holding, supra.*

The *Montgomery Ward* opinion clearly noted that where, as in the instant case, the lessor fails to structure the lease in a self-amortizing fashion that the contract does not allow the lessor, in hindsight, to "risk shift" after the fact. As the Third Circuit described, and as General Electric forcefully argued, in that case, the lessor's risk-taking decision structuring the lease performance in the absence of residual values were, and are, economic business decisions that General Electric, and General Electric alone, made at the inception of the contracts at issue.

The holding in *In re Montgomery Ward Holding* underscores the Uniform Commercial Code approach to claims of liquidated or punitive damages and that, "their consistent approach to all damage issues is that the victim of a breach cannot be placed in a better position than it would have occupied if the contract had been performed." (326 F.3d at 388.)

The Third Circuit approach accurately summarized the majority view as follows: "And in the present context that conforms to the view adopted by the majority of courts that have construed the U.C.C. provision: no true liquidated damages provision can put the lessor in a position legally superior to the one that it would have occupied had the lease been fully performed." (Citations omitted). 326 F.3d at 388.

In sum, the *Montgomery Ward* decision instructs accountability by the lessee of only the future lease payment stream reduced to present value. The opinion also requires "demonstrable damages" measured in terms of what the lessor would have had as an absolute right at the end of the lease term. In that case, as here, the lessor was entitled only to return of the equipment without residual value contract rights. The court also noted that terms, by their very nature, designed to secure performance bearing no rational relation to damages are, as a matter of law, construed as penalties and are invariably determined to be unenforceable.

The *Montgomery Ward* panel also noted that the performance obligations of the lease in question only required return of the leased equipment. The decision states:

> In comparison to the actual financial obligations called for by performance of the leases (remembering that Lechmere had no contractual obligation at the end of the term other than to return the equipment), the excessively large Casualty Value figures provided powerful *in terrorem* pressure for Lechmere to perform the leases rather than (for example) to terminate them voluntarily and pay the price for doing so in real damages. And the situation is of course no different when we look at a premature termination triggered by bankruptcy.

326 F.3d at 390.

Finally, the Third Circuit described the situation as follows:

> To recapitulate, Meridian deliberately chose to establish a lease pricing structure that substituted a lower (and thus more attractive to a lessee) monthly rental, with the potential for recoupment of its investment plus a profit through a hoped-for (but in no way assured) course of events after the lease ran its course, for a safer (but less attractive) higher rental that (when coupled with the expected value of the remainder interest) would provide for amortization of the investment and profit during the lease term. It cannot be heard to say that it made that choice in ignorance of the well-established Illinois doctrine that blocks purported liquidated damages provisions that the courts instead classify as penalties. 326 F.3d at 390.

\* \* \*

> In short, Meridian gambled on the future and lost – and because its hoped-for recoupment constituted an unenforceable penalty, it cannot shift the risk of that loss to Montgomery Ward.

326 F.3d at 391.

In the case at bar, General Electric provided a definitive lease term (60 months) without recourse to residual values. The plaintiff calculated up front its preferred stated rate of return and profitability rolled into an amortized monthly lease payment. The General Electric contracts at issue fail to reduce any amounts to present value and fail to provide the lessee with a fair market value credit for the disposition and sales proceeds for the collateral.  General Electric has provided no basis in law, or fact, for its illegitimate application of the "Casualty Occurrence" and "Stipulated Loss" amounts it seeks to recover in addition to its ordinary contract claims.

### IX.   CONCLUSION

In sum, General Electric's prior pleadings, motions, and countrywide survey of applicable law under the Uniform Commercial Code clearly illustrates and highlights the deficiencies in General Electric's position in this case. According to General Electric, its own lease contracts are violative of all applicable law, both common and uniform, determining the enforceability of a liquidated damage clause. General Electric has violated, cumulatively, every conceivable basis upon which the case law collectively disaffirms the imposition of penal damages. General Electric's stated positions and briefings in support of the *In re Montgomery Ward Holding Corp.* case were, and are, a correct statement of the law. The Uniform Commercial Code, official comments thereto, the case law, and commentary are in agreement as to the proper method and manner of damage calculation which merely places the lessor in a position similar to that in the event of full performance under the lease contracts. As a consequence, the defendants should be accorded judgment as a matter of law.

It is undisputed that the General Electric lease provisions in the instant case fail, as a matter of law, under the considerations raised above to include: (1) no credit contractually to the lessees for the fair market value of the sold equipment; (2) no reduction to present value of future rental/lease payment stream; (3) no contractual estimation as to the relationship between the "casualty occurrence" and "stipulated loss" values as against the actual damages incurred by General Electric; (4) liquidated damage

valuations exceeding by 100%-400% a simple contract damages analysis; (5) no present value calculations within the four corners of the contract; (6) no "residual" values imposed upon the lessee within the four corners of the contract; (7) no obligations imposed upon the lessee to perform or release or incur any further obligations to the lessor beyond the four corners of the contract (60 months); and (8) that the plaintiff has failed to offer evidence in satisfaction of its obligations that a "commercially reasonable" disposition of the collateral was achieved in mitigation of its claimed damages.

The liquidated damage clause must be rejected in this case. An analysis under the Uniform Commercial Code (A.R.S. §47-2A-528), by contract, and by agreement of the parties, reflects that the offset in mitigation of plaintiff's contract damages ($399,000.00) be reduced by a fair market valuation of the equipment (also uncontested) between $690,000.00 to $710,000.00. The "sale" in the "sweetheart" deal to Arizona Materials at a $350,000.00 deficiency to the equipment's fair market value does not convert plaintiff's financial recklessness into "evidence" of damages. Had General Electric merely conducted a commercially reasonable sale of the equipment, it would not have attempted to rewrite the contracts and the law, which it has admitted are uniformly dispositive on the issues briefed herein. General Electric has not met its burden of proof in demonstrating that a commercially reasonable sale was accomplished in this matter, and General Electric has failed in its proof and evidence of its damage claims exceeding by 100%-400% its ordinary contract claims. Judgment for the defense is requested, together with an award of defendants' reasonable attorneys' fees and costs incurred.

DATED this 13th day of January, 2006.

> GRANT H. GOODMAN, PLLC
>
> /s/ Grant H. Goodman, #009463
> Grant H. Goodman
> Co-Counsel of Record for Defendants

ORIGINAL electronically filed and copies mailed this 13th day of January, 2006, to:

Honorable Roger S. Strand
Judge, United States District Court
401 West Washington Street
Phoenix AZ  85003

Michael Tsang, Esq.
Joseph O'Neil, Jr., Esq.
REED SMITH LLP
599 Lexington Avenue
New York NY 10022
Attorneys for Plaintiff

Renee Gerstman, Esq.
RENEE GERSTMAN, PLLC
3550 North Central Avenue
Suite 710
Phoenix AZ 85016
Co-Counsel of Record for Defendants


/s/ Grant H. Goodman